# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

CHRISTINE TYLER,                           )
                                           )
            Plaintiff,                     )
                                           )
       v.                                  )        No. 4:08-CV-00090 JD
                                           )
THE TRUSTEES OF PURDUE                     )
UNIVERSITY,                                )
                                           )
            Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment [DE 24], filed on

September 30, 2010.  Plaintiff responded on January 7, 2011 [DE 34], and Defendant replied on

February 18, 2011 [DE 39].  For the following reasons, Defendant's motion for summary

judgment is GRANTED.

## I. Background

Christine Tyler was hired as the director of the Organizational Effectiveness Department

("OE") for Information Technology at Purdue ("ITaP") on or about April 14, 2005.  [DE 27-1 at

3-4].  At the time Tyler was hired, ITaP was comprised of the following seven business areas: (1)

Teaching and Learning Technologies; (2) Rosen Center for Advanced Computing; (3)

Infrastructure; (4) Enterprise Applications; (5) Customer Relations; (6) Security and Privacy;

and, (7) Architecture and Licensing.  [DE 27-2 at ¶ 11].

Tyler's department, OE, was intended to provide support to all seven of ITaP's business

units by increasing the effectiveness of ITaP and improving the overall climate within the

organization.  *Id.* at ¶ 7.  As the Executive Director of OE, one of Tyler's main responsibilities

was to implement the Job Family System, a method of establishing that appropriate compensation and employee growth opportunities existed within ITaP. [DE 36-1 at 2; DE 27-2 at ¶ 7]. OE's role in the Job Family System was to obtain information for grouping similar jobs by compiling data from private industry and other organizations. [DE 27-2 at ¶ 8]. OE was then tasked with creating salary guidelines for all positions within those created "job families." *Id.* at ¶ 9. Tyler's previous experience with implementation of the Job Family System was one of the main reasons she was hired as Director of OE. *Id.* at ¶ 10.

In January 2006, Tyler's supervisor, Vice-President and Chief Information Officer James Bottom, assigned Tyler to manage three business units that were previously managed by Deputy CIO Brett Coryell: the Communications unit, the Informatics and Media Relations unit, and the Video and Multimedia Services unit. [DE 36-2 at 3, ¶ 13]. Tyler's March 2006 performance appraisal reflects that of Bottom's direct reports, Tyler received the highest performance rating while Coryell received the lowest. *Id.* at 14.

In June 2006, Bottum resigned from his position and Dr. William G. McCartney was appointed Interim Vice-President and Chief Information Officer. [DE 27-2 at ¶ 17]. McCartney examined the structure and functions of ITaP and concluded that the organization needed to refocus its resources and efforts to its core mission: providing computing support for research, teaching, and administration. *Id.* at ¶ 18. According to McCartney, ITaP had grown too much and employed individuals who provided redundant services that other offices on Purdue's campus were capable of providing. *Id.* at ¶ 19. For example, McCartney determined that OE was unnecessary and did not support ITaP's core mission. *Id.* at ¶ 26. McCartney identified the following OE positions that he believed could be eliminated: (1) Workforce Development Manager (a staffed position); (2) Research Coordinator (a staffed position); (3) Director of

Research Administration (a vacant position); (4) Executive Director of OE (Tyler's position); and, (5) Deputy CIO (Coryell's position). *Id.* at ¶ 27.

After obtaining the support of Purdue's provost and executive vice president/treasurer and consulting with Human Resource Services and legal counsel, McCartney decided to eliminate four of the positions and reorganize ITaP. *Id.* at ¶¶ 20, 28. McCartney devoted the money saved from the elimination of the positions to research computing, the core mission of ITaP. *Id.* at ¶ 28. The reorganization effectively eliminated the OE Department, including Tyler's position as its executive director. *Id.*

However, McCartney did not eliminate Coryell's position at this time. Instead, he demoted Coryell to the newly created position of Executive Director of Administrative Services. Given that Tyler had been laid off, Coryell reassumed responsibility for all of ITaP's divisions, including the three that had been reassigned to Tyler. *Id.* at ¶ 31. McCartney contends that he did not fire Coryell because Coryell also held the position of Project Manager for the OnePurdue User Support Project ("OnePurdue"). *Id.* at ¶ 30; [DE 27-1 at 14]. McCartney contends that he planned to eliminate the position of the Executive Director of Administrative Services completely once the OnePurdue project was finished. [DE 27-2 at ¶ 31]. Coryell ultimately accepted a position with another university and left Purdue in or around the spring of 2007. *Id.* at ¶ 37. Coryell's position was eliminated upon his departure. *Id.*

On January 9, 2007, McCartney notified Tyler of the decision to eliminate her position. [DE 27-2 at ¶ 32; DE 36-1 at 13]. Tyler received a written letter from McCartney on Purdue letterhead, stating that her position would be eliminated and she would be placed on layoff status effective 31 days later, on February 9, 2007. Also on January 9, the Workforce Development Manager and Research Coordinator were informed that their positions were eliminated. [DE 27-2

at ¶ 35].

McCartney states that there were additional reductions in workforce within ITaP in July 2007. *Id.* at ¶ 36. On August 6, 2007, five additional positions within ITaP's Teaching and Learning Technologies unit were eliminated. *Id.* at ¶ 38. McCartney states that he eliminated these five additional positions, which focused on outreach and conferences, because he had identified them as redundant and non-supportive of ITaP's core mission. *Id.*

On January 29, 2007, Tyler filed a grievance pursuant to Purdue policy. [DE 27-3 at 3; DE 36-1 at 39]. Tyler alleged that the University employed an RIF improperly in several respects. Of note to this case, she alleged that her position was simply renamed and given to Coryell, which she claimed was in violation of University RIF policy. [DE 27-3 at 3; DE 36-1 at 40]. After receiving evidence from the parties involved and conducting a hearing on February 8, 2007, Purdue's vice provost for academic affairs, Christine Ladisch, concluded that McCartney used appropriate judgment in applying the University's RIF Policy and in eliminating Tyler's position as Executive Director of OE. [DE 27-3 at 3-4].

On February 16, 2007, Tyler submitted a written complaint and initiated a step two grievance procedure on the same grounds as her step one grievance. *Id.*; [DE 36-1 at 41]. A grievance review committee was selected, a hearing was held, Ladisch's decision in the step one grievance was affirmed. [DE 27-3 at 3]. The committee found that "work performance should only be considered in a reduction in workforce decision if the knowledge, skills, and abilities (KSAs) of staff are equal." [DE 36-2 at 33]. The committee determined that "the KSAs of Ms. Tyler and Mr. Coryell were not equal, and the Mr. Coryell clearly possessed the requisite KSAs for the Executive Director, Administrative Services position." *Id.*; *see also* [DE 27-1 at 46] ("Consideration must be based on objective, job-related standards, which may include

4

differences in knowledge, skills, abilities, and documented work performance."). The committee concluded that "McCartney used appropriate judgment and had properly applied the University's RIF policy when he eliminated Tyler's position as Executive Director of OE." [DE 27-3 at 4]. After receiving the committee's findings and recommendations, Purdue's president issued a final decision concurring with the committee's findings and upholding the decision in the step one grievance. *Id.* at 3.

On May 8, 2007, Tyler filed a complaint with Purdue University, alleging harassment and discrimination on the bases of sex and age, and retaliation. [DE 27-4 at 13]. Tyler claimed that the RIF was improperly used, and sought reinstatement and back pay. *Id.* After engaging in an investigation conducted pursuant to university policy, Purdue's vice president for human relations found against Tyler on all of her claims. [DE 27-4 at 4, 19-20].

On July 5, 2007, Tyler filed a Notice of Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, alleging discrimination on the basis of sex in violation of Title VII of the Civil Rights Act, discrimination on the basis of age in violation of the Age Discrimination in Employment Act, and retaliation for raising issues of equal pay and fair labor standards compliance. *Id.* at 4.

On November 20, 2008, Tyler filed this action. [DE 1]. Her complaint alleges discrimination on the basis of sex in violation of Title VII of the Civil Rights Act, retaliation in violation of both Title VII and the Equal Pay Act, discrimination on the basis of age in violation of the Age Discrimination in Employment Act, breach of contract, and promissory estoppel. *Id.* Purdue filed its motion for summary judgment on September 30, 2010. [DE 24].

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has met this burden, the nonmoving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue necessitating trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).

If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23) (holding that a

failure to prove one essential element "necessarily renders all other facts immaterial")). In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

## III. Discussion

### A. Title VII Gender Discrimination

Tyler first alleges that Purdue terminated her employment because of her gender, in violation of Title VII. [DE 1 at ¶¶ 29-32]; *see* 42 U.S.C. § 2000e-2(a) (gender). Unlawful discrimination may be proved though direct evidence of impermissible motive, or indirectly through the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03 (1973). *See also Bellaver v. Quanex Corp.*, 200 F.3d 485, 492-93 (7th Cir. 2000) (applying this method to gender discrimination cases). Tyler does not argue that any direct evidence of impermissible motive exists, and no direct evidence is before the Court. Instead, Tyler relies on the indirect method, which requires her to establish four distinct elements of a prima facie case: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated person outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Bellaver*, 200 F.3d at 493.

However, "[b]ecause unlawful discrimination can occur in a variety of employment contexts, '[the Seventh Circuit has] adapted the requirements for making a prima facie case in special cases to reflect the reality of the workplace.'" *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002) (quoting *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d

687, 693 (7th Cir. 2000) (age discrimination case)). *See also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (noting that the *McDonnell Douglas* framework applies to both claims of age and sex discrimination). As a result, the showing necessary to establish differential treatment depends on the facts of the case.

A traditional reduction in force ("RIF") occurs when an employer decides to permanently eliminate multiple positions from its workforce, allegedly for economic reasons. *Bellaver*, 200 F.3d at 494; *Michas*, 209 F.3d at 693. In an RIF case, a plaintiff must make a factual showing that similarly situated employees not in the protected class were treated better than the terminated plaintiff. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 691 n.1 (7th Cir. 2006); *Michas*, 209 F.3d at 693; *Schmidt v. R. Lavin and Sons, Inc.*, No. 00-C-0804, 2001 WL 290362, at *5 (N.D. Ill. Mar. 22, 2001).

In contrast, a mini-reduction in force ("mini-RIF") occurs when a single employee is terminated, allegedly for economic reasons, and the employee's duties are absorbed by other employees who were not terminated. *Merillat*, 470 F.3d at 690; *Michas*, 209 F.3d at 693; *Hamilton v. Nat'l Propane*, 276 F. Supp. 2d 934, 944-45 (W.D. Wis. 2002); *Bellaver*, 200 F.3d at 495 ("The point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced' not eliminated.").

Unlike a traditional RIF case, a plaintiff in a mini-RIF case need not make a factual showing that similarly situated employees were treated better, because the inference of discrimination arises from the fact that they were outside of the protected class. *Merillat*, 470 F.3d at 690; *Michas*, 209 F.3d at 693; *Bellaver*, 200 F.3d at 495. Instead, the plaintiff need only show that his job duties were absorbed by an employee outside the protected class. *Hemsworth,*

*II v. Quotesmith.com, Inc.*, 476 F.3d 487, 492 (7th Cir. 2007); *Merillat*, 470 F.3d at 690-91;

*Michas*, 209 F.3d at 693; *Hamilton*, 276 F. Supp. 2d at 945-46 (noting that the plaintiff must

additionally show that an employee *outside the protected class mostly* absorbed the terminated

plaintiff's job duties, in terms of proportional comparison to other employees within the

protected class who also absorbed some of the job duties).

"[T]he determinative factor in deciding whether the mini-RIF variation applies is whether

the discharged employee's duties were absorbed by an existing employee or eliminated, not the

number of employees let go." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir.

2008); *accord Merillat*, 470 F.3d at 691 n.1 (employing a mini-RIF analysis to a case in which

multiple individuals were laid off and their duties were absorbed by remaining workers); *Paluk*

*v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 n.5 (7th Cir. 2000) ("For purposes of deciding the

proper prima facie case requirements to apply, our inquiry is dependent not on the number of

employees terminated, but 'on whether the [the employer] still needed [the plaintiff's] job

responsibilities to be performed.'") (quoting *Michas*, 209 F.3d at 694).

The layoff in this case is best categorized as a mini-RIF for purposes of legal analysis.

Purdue contends that Tyler's duties were not assumed by other employees. [DE 25 at 8; DE 36-

3 at ¶ 8]. Instead, according to Purdue, the RIF's goal was to purge ITaP of non-essential

functions in order to focus on research computing. [DE 25 at 8]. But the parties agree that Tyler

was responsible for managing 18 employees directly, and that Coryell assumed these managerial

duties after Tyler's termination. [DE 27-2 at ¶ 31]. In fact, McCartney's affidavit clearly states

that upon Tyler's departure, Coryell "reassumed responsibility over the Communications unit,

the Informatics unit, and the Media Production Services unit that had been assigned to Tyler."

*Id.* Because these functions were reassigned, the court will employ a mini-RIF analysis.[1] *See Merillat*, 470 F.3d at 691 n.1 (considering layoff a mini-RIF despite the fact that multiple individuals were let go); *Paluk*, 221 F.3d at 1012 n.5 (same).

## 1. Prima Facie Case

As a threshold matter, the evidence establishes the first three elements of Tyler's claim conclusively. The evidence establishes: (1) that Tyler is a woman, and is therefore within a protected class for purposes of Title VII; (2) that Tyler was performing at a level that met her employer's legitimate expectations [DE 36-2 at 14-17; DE 36-3 at ¶ 11]; and (3) that Tyler was subject to an adverse employment action when she was laid off.

Tyler has also established that her duties were absorbed by employees not in the protected class. As noted previously, Tyler's managerial duties over the Communications unit, the Informatics unit, and the Media Production Services unit were absorbed by Coryell, a male, after Tyler's departure in January 2007. [DE 27-2 at ¶ 31]. Accordingly, on January 9, 2007, McCartney's email announced that ITaP's Organizational Effectiveness and Assessment departments had been eliminated, but that the Communications department would report to Coryell as Executive Director of Administrative Services.[2] [DE 27-1]. Based on these undisputed facts, the Court finds that Tyler has established a prima facie case of gender discrimination.

---

[1] Moreover, the court notes that Tyler's claim would fail even if the court were to employ a traditional RIF analysis. Under this scenario, Tyler would have to show that similarly situated employees not in the protected class were treated better than her in order to make out a prima facie case of gender discrimination. *See Merillat*, 470 F.3d at 691 n.1; *Michas*, 209 F.3d at 693. But even under this analysis, Tyler's claim would nevertheless fail because she has not submitted evidence sufficient for a reasonable jury to conclude that Purdue's proffered reason for firing her was a pretext for discrimination. *See infra* Pt.III.A.3.

[2] The email also noted that human resources functions would be performed by Jackie Wilson, a woman. *Id.* However, Tyler does not assert that she ever performed the human resources functions assigned to Wilson. *See* [DE 1 at 16] (claiming only that Wilson "maintained her responsibilities" after ITaP's reorganization).

*2. Legitimate Reason*

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  If such a reason is proffered, the plaintiff then bears the ultimate burden of showing that it is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Michas*, 209 F.3d at 692-93**.**  "A pretext . . . is a deliberate false-hood." *Petts*, 54 F.3d at 726 (citing *Kodl v. Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007)).  To show pretext, the plaintiff must show more than that the defendant's decision was mistaken, ill considered or foolish, and as long as the employer honestly believes the reasons it gives, pretext has not been shown.  *Id.* (citing *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)).  The Court does "not sit as a 'super-personnel department,' weighing the wisdom of a company's employment decisions; rather, [it is] concerned only with whether the employer's proffered explanation was honest." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001).

Here, Purdue cites McCartney's reorganization plan for ITaP as the reason for Tyler's termination.  Purdue explains that

> McCartney determined that ITaP needed to refocus resources and efforts to its core mission (i.e., to provide computing support for research, teaching, and administration).  McCartney determined that ITaP had grown too much and employed individuals who provided redundant services that other offices on Purdue's campus were capable of providing (if not already providing). ...  McCartney identified the following OE positions that he believed could be eliminated: (1) Workforce Development Manager (a staffed position); (2) Research Coordinator (a staffed position); (3) Director of Research Administration (a vacant position); (4) Executive Director of OE (Tyler's position); and, (5) Deputy CIO (Coryell's position).  After consulting with Human Resource Services and legal counsel, McCartney decided to eliminate the five positions and reorganize ITaP.[3]

---

[3] Tyler correctly points out that only three staffed and one unstaffed positions were eliminated immediately.  *See* [DE 34 at 7].

> Consequently, the positions were eliminated, and the money saved from the elimination of the positions was reallocated to research computing, the core mission of ITaP. The reorganization effectively eliminated the OE Department.

[DE 26 at 4]. Evidence provided by Purdue supports the contention that ITaP's reorganization was the reason for Tyler's termination. On January 9, 2007, the day Tyler was laid off, McCartney sent ITaP staff an email entitled "Organizational Changes", which stated that "ITaP's organizational effectiveness and assessment departments have been eliminated to reallocate resources to our research computing efforts." [DE 27-1 at 30].

Purdue states that McCartney intended to give some of Tyler's responsibilities to Coryell temporarily and to rename him Executive Director of Administrative Services, since Coryell was simultaneously employed as Project Manager for the OnePurdue User Support Project. [DE 27-2 at ¶ 31]. Once Coryell's services for OnePurdue were finished, however, McCartney stated that he planned to eliminate Coryell's position completely. *Id.* Purdue contends that Coryell was retained as Executive Director of Administrative Services instead of Tyler due to his involvement with OnePurdue, as well as his technical skills. *Id.*; [DE 36-2 at ¶ 9]. Coryell subsequently accepted a job with another university, and his position was eliminated. [DE 27-2 at ¶ 37].

In August 2007, after determining that five additional positions in ITaP's Teaching and Learning Technologies unit were also non-supportive of ITaP's core mission, McCartney eliminated these positions as well. Id. at ¶ 38.

### 3. Pretext

Tyler disputes Purdue's contention that ITaP's reorganization motivated her firing, and claims that Purdue's proffered reasons are mere pretext for discrimination on the basis of gender. However, she provides almost no evidence, aside from her own sworn affidavit and deposition

testimony, in support of this blanket legal conclusion. *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact").

Tyler provides no evidence to establish that she had the technical knowledge necessary to perform the functions ultimately delegated to Coryell. She does point out that she received better performance evaluations than Coryell, suggesting that she should have been retained as Executive Director of Administrative Services rather than him. [DE 36-2]. However, the report of the committee that reviewed Tyler's grievance (an exhibit submitted by Tyler) concluded that "Tyler did not provide evidence that she possesses the requisite [knowledge, skills and abilities] for the Executive Director, Administrative Services position", but that Coryell did. [DE 36-2 at 33; DE 27-1 at 46 (citing these criteria)]. Tyler claims that Coryell's job description does not include work on the OnePurdue project, but also acknowledges that he co-led a portion of that project. [DE 36-2 at ¶ 25]. The committee cited Purdue policy dictating that work performance should only be considered in a RIF decision when staff members' knowledge, skills, and abilities are equal. *Id.*; [DE 27-3 at ¶ 11] (concluding that the RIF was conducted in compliance with University policies); *see also Krchnavy*, 294 F.3d at 878 ("Although it is certainly arguable that [plaintiff] was well-qualified for [the open] position, this line of reasoning is not relevant to the underlying issue of pretext."); *Ritter v. Hill 'N Dale*, 231 F.3d 1039, 1044 (7th Cir. 2000) ("This court has consistently emphasized that it will not 'sit as a super personnel department to review an employer's business decisions.'" (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000))); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[A] plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment

13

actions.").

Tyler also suggests that notwithstanding McCartney's announcement that Coryell had been demoted from CIO to Executive Director of Administrative Services, Coryell continued to serve as CIO until his departure in July 2007. [DE 35 at ¶ 15]. In support of this claim, she submits printouts of Linkedin and EDUCAUSE peer directory websites. [DE 36-2 at 21, 29, 30]. Even if the Court were to consider these submissions as admissible evidence, their weight is not sufficient to create an issue of fact as to Coryell's actual job at Purdue between January 9, 2007, and his departure later that year. Tyler has presented no evidence to suggest that Purdue had the ability to update Coryell's profile on either website. And even if Purdue did have that ability, Tyler has presented no evidence to suggest that the websites remained the same as a result of Purdue's intent, rather than an oversight on Purdue's part. Moreover, it would not follow from a showing that Coryell's title had not actually changed that ITaP's restructuring was a pretext for gender-based discrimination.

Contrary to Tyler's assertion, Purdue has not offered conflicting explanations to justify Tyler's termination. *See Patmythes v. City of Janesville*, 181 F. App'x 596, 598 (7th Cir. 2006) (inferring pretext when an employer offers shifting explanations for a termination); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999) (same). Purdue's offered justifications are consistent and clear: With the goal of refocusing ITaP on its core mission of research computing, Tyler's department and her middle-management position were eliminated. Her duties that were not focused on research computing were eliminated. Jackie Wilson was reassigned as Human Resources Manager. Tyler's other reports were reassigned to Coryell. Coryell was retained due to his technical knowledge. [DE 27-1 at 30 (McCartney email dated January 9, 2007); DE 27-1 at 36 (vice provost letter dated February 12, 2007); DE 36-2 at 31-33

(Grievance Review Committee report of March 7, 2007 hearing); DE 27-1 at 37 (president letter dated March 14, 2007); DE 27-2 at ¶¶ 29-32 (McCartney affidavit dated September 27, 2010); DE 36-3 at ¶ 8 (interrogatory response dated November 9, 2010)]. Purdue's response to interrogatory 8 stating that Tyler's position was eliminated, [DE 36-3 at ¶ 8], is uncontroverted, and does not conflict with the explanation offered by Purdue.

Finally, Tyler suggests that the Court should infer that Purdue's stated justification for her termination was a pretext for discrimination from the fact that, according to her, other employees terminated by the RIF, Workforce Development Manager Don Porter and Research Coordinator Karen Whitney, were involved in research computing. [DE 35 at 6; DE 34 at 7]. But the elimination of these two administrative positions is completely consistent with the stated purpose of the RIF: eliminating redundant functions and managerial staff to refocus ITaP on its core mission of research computing. The RIF also eliminated the vacant Director of Research Administration position–another administrative job. [DE 27-2 at ¶ 27; DE 36-2 at 20]. As stated in bold in the organizational chart depicting the RIF (an exhibit submitted by Tyler), the elimination of these positions resulted in hundreds of thousands of dollars being "reallocated to ITaP Research Computing". [DE 36-2 at 20]. As a result, Tyler's contention on this issue is insufficient to create a genuine issue of material fact as to pretext.

Because the evidence before the Court would not allow a reasonable jury to conclude that Purdue's proffered justification for Tyler's termination was pretextual, Tyler's Title VII gender discrimination claim must fail.

## B. Retaliation

Tyler next contends that she was retaliated against for engaging in protected activity, in violation of Title VII and the Equal Pay Act (EPA). [DE 1 at ¶¶ 33-36]. Because the same legal

analysis governs retaliation claims under Title VII and the EPA, the court will consider all of Tyler's retaliation claims together. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (applying the same legal standard to retaliation claims under Title VII and the EPA); *see also Cnty. of Washington v. Gunther*, 452 U.S. 161, 178-80 (1981) (commenting that Title VII's coverage of equal pay claims is broader than that of the EPA, which applies only to gender discrimination); *Fallon v. Illinois*, 882 F.2d 1206, 1218 (7th Cir. 1989) (holding that the EPA and Title VII are distinct remedies).

Under Title VII, it is unlawful for any employer to discriminate against an employee for "oppos[ing] any practice made an unlawful employment practice by [the Act], or because he has made a charge . . . under [the Act]. 42 U.S.C. § 2000e-3(a). Simply put, "[a]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII." *Racicot v. Wal-Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir. 2005); *accord Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Title VII prohibits discrimination based on religion, sex, or nation origin. 42 U.S.C. § 2000e-3(b).

As with her gender discrimination claim, Tyler proceeds under the indirect method of proving her retaliation claim. *See* [DE 34] (claiming to identify similarly situated comparators). Under the indirect method of proof, a plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; (3) he met his employer's legitimate expectations; and (4) he was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *Allen v. Fort Wayne Foundry Corp.*, 614 F. Supp. 2d 943, 957 n.14 (N.D. Ind. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). If the plaintiff makes a prima facie case, the defendant must proffer a legitimate,

non-invidious reason for the adverse employment action. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004). "Although the burden of production shifts to the defendant under this method, 'the burden of persuasion rests at all times on the plaintiff.'" *Rhodes*, 359 F.3d at 508 (quoting *Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). The burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Hill*, 625 F.3d at 1001; *Rhodes*, 359 F.3d at 508.

Tyler claims that Purdue retaliated against her for protesting her colleague Scott Ksander's promotion by recommending that McCartney conduct a nationwide search before filling the position of Executive Director of Security and Networks. [DE 34 at 11]. Tyler also claims that she was retaliated against for opposing pay disparities at Purdue, which she states that she complained about in numerous emails to her supervisors throughout her tenure. [DE 36-1 at 22-23]. *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (holding that self-serving deposition testimony based on personal knowledge may satisfy a party's evidentiary burden on summary judgment).

Assuming arguendo that Tyler could make out a prima facie case of retaliation, her inability to establish that Purdue's proffered reason for her termination–ITaP reorganization based on the RIF–is pretextual is nevertheless fatal to her retaliation claim. For the reasons discussed in connection to Tyler's claim of gender discrimination, *supra* Pt. I.A.3., the Court concludes that the submitted evidence would not allow a reasonable jury to conclude that Purdue's proffered justification for Tyler's termination was pretextual. Tyler's retaliation claims under Title VII and the EPA therefore must fail as well.

## C. ADEA

Tyler also brings suit under the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, *et seq.*, alleging that Purdue intentionally and willfully discriminated against her because of her age. Purdue claims immunity from suit on this basis under the Eleventh Amendment, which bars actions in federal court against a state, state agencies, or state officials acting in their official capacities. *Ind. Prot. and Advocacy Servs. v. Ind. Family and Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (internal citations omitted)); *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694-95 (7th Cir. 2007). Tyler, however, argues that the Eleventh Amendment does not bar her suit. [DE 34 at 8].

There are three principal exceptions to the Eleventh Amendment's bar. *Ind. Prot. and Advocacy*, 603 F.3d at 371 (citing *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000)). First, a state may waive immunity by consenting to suit in federal court. *Id.* Second, Congress may abrogate the state's immunity through a valid exercise of its powers under recognized constitutional authority, such as by later constitutional amendments. *Id.* Third, under *Ex parte Young*, 209 U.S. 123, 159-60 (1908), a plaintiff may file suit against individual state officials seeking prospective equitable relief for ongoing violations of federal law. *Ind. Prot. and Advocacy*, 603 F.3d at 371; *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987).

Tyler presents no evidence and makes no argument that Purdue has consented to suit in federal court or that Congress has abrogated Indiana's sovereign immunity. But Tyler does claim that the *Ex parte Young* exception applies because Tyler seeks the "prospective equitable relief" of reinstatement. [DE 34 at 8].

Relevant precedent contradicts Tyler's claims. "[The Eleventh Amendment's] jurisdictional bar applies regardless of the nature of the relief sought." *Gleason v. Bd. of Educ.*

*of City of Chicago*, 792 F.2d 76, 79 (7th Cir. 1986) (quoting *Pennhurst State Sch. & Hosp. v. Haldermann*, 465 U.S. 89, 100 (1984)).  Instead, "[w]hen a court considers a claim of Eleventh Amendment immunity, it must first determine whether the plaintiff is suing the state." *Wasserman v. Purdue Univ.*, 431 F. Supp. 2d 911, 915 (N.D. Ind. 2006).  Purdue University is a state entity for Eleventh Amendment purposes.  *Kashani*, 813 F.2d at 845; *Wasserman*, 431 F. Supp. 2d at 915; *Wellman v. Trustees of Purdue Univ.*, 581 F. Supp. 1228, 1231-32 (N.D. Ind. 1984).  This Court draws no distinction between "between Purdue University and its Board of Trustees."  *Wasserman*, 431 F. Supp. 2d at 915 (quoting *Wellman*, 581 F. Supp. at 1228 n.1).  Although *Ex parte Young* may permit claims against individuals sued in their official capacities, *see*, *e.g.*, *Kashani*, 813 F.2d at 848 (affirming dismissal of suit against "The Trustees of Purdue University" while permitting suit against individually named officials for the injunctive relief of reinstatement), it does not permit suits against state entities, regardless of the relief sought. *Gleason*, 792 F.2d at 79.

Tyler named only the Trustees of Purdue University as a defendant in this case.  Tyler did not bring suit against individual Trustees, either in their official or individual capacities. Purdue University and its Board of Trustees are state entities immune to suit.  *Kashani*, 813 F.2d at 848.  Because Purdue has not waived that immunity, and because Congress has not abrogated Indiana's immunity to suit under the ADEA, the Eleventh Amendment precludes this court from exercising jurisdiction.  *See Wasserman*, 431 F. Supp. 2d at 915 (employing the same analysis and reaching the same conclusion on another ADEA claim).

Because she has failed to establish that any exception to Purdue's sovereign immunity

under the Eleventh Amendment's applies, Tyler's ADEA claim must fail.[4]

**D. State Law Claims**

Having dismissed the claims over which this Court had original jurisdiction, the Court has the discretion to dismiss the remaining state claims under 28 U.S.C. § 1367(c)(3). *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 619 (1988); *Bean v. Wis. Bell, Inc.*, 366 F.3d 451, 456 (7th Cir. 2004). A district court exercises significant discretion in determining whether to retain such pendent claims, based upon "the principles of considerations of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Cohill*, 484 U.S. at 357. Given these principles, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). However, courts have recognized three exceptions to this general rule: when (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"; or (3) "when it is absolutely clear how the pendent claims can be decided." *Id.*

The Court finds the latter two grounds for an exception applicable in this case. Here, both parties have briefed Tyler's state law claims, and this Court is intimately familiar with the details of the case. Requiring the state court to address these claims would cause a substantial duplication of effort. Additionally, the supplemental claims are straightforward and easily

---

[4] Even if the Eleventh Amendment did not bar Tyler's ADEA claim, Tyler's failure to establish pretext would doom this claim as well. *See Peirick*, 510 F.3d at 687 (applying the same *McDonnell Douglas* framework to Title VII and ADEA claims).

decided based on established state precedent. For these reasons, the Court elects to exercise supplemental jurisdiction over Tyler's state law claims.

**1. Breach of Contract**

Tyler also brings a claim for breach of contract, claiming that her written appointment to her position at Purdue constituted an employment contract which Purdue breached in laying her off. But even assuming for the sake of argument that Tyler's appointment [DE 27-1 at 24] does constitute a employment contract, evidence before the court establishes that Purdue did not breach it in terminating Tyler.

In Indiana, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993); *accord Collins v. McKinney*, 871 N.E.2d 363, 368 (Ind. Ct. App. 2007). The goal of contract interpretation is to ascertain and give effect to the parties' intent. Collins, 871 N.E.2d at 372 (citing *Berkel & Co. Contractors, Inc. v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 657 (Ind. Ct. App. 2004)). In interpreting a written contract, the Court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Id.* "Contracts should not be so narrowly interpreted as to frustrate their obvious design or so loosely interpreted as to relieve a party of a liability fairly within the scope of the contract's terms." *Anderson v. Horizon Homes, Inc.*, 644 N.E.2d 1281, 1290 (Ind. Ct. App. 1995) (citing *Radio Picture Show P'ship v. Exclusive Int'l Pictures, Inc.*, 482 N.E.2d 1159, 1167 (Ind. Ct. App. 1985)).

In this case, Tyler claims that Purdue breached the terms of her appointment by terminating her employment. [DE 34 at 12-13]. Tyler's appointment expressly incorporates Executive Memorandum B-55, entitled "Terms and Conditions of Employment of

Administrative and Professional Staff". [DE 27-1 at 24]. The appointment also states that no extrinsic agreements not covered by the appointment affect its terms and conditions. *Id.*; *see also Hinkel v. Sataria Distrib. & Packaging, Inc.*, 920 N.E.2d 766, 769 (Ind. Ct. App. 2010) ("If the contract is completely integrated, constituting a final and complete expression of all the parties' agreements, then evidence of prior or contemporaneous written or oral statements and negotiations cannot operate to either add to or contradict the written contract.") (citing *Franklin v. White*, 493 N.E.2d 161, 167 (Ind. 1986)).

In a section titled "Termination During Appointment", Memorandum B-55 states that "The University may terminate the employment of any administrative or professional staff member before the end of [the] term of appointment by giving him/her written advance notice on Form 19E of such intention at least 30 calendar days prior to termination." [DE 27-1 at 39]. Thus, insofar as Tyler's appointment constituted a contract, it also provided that the University could terminate Tyler's employment at any time in the manner dictated in Memorandum B-55.

Tyler received written notice of her layoff on January 9, 2007, in a letter on Purdue letterhead signed by her supervisor. [DE 36-1 at 36]. That letter informed Tyler that her position would be eliminated 31 days later, on February 9, 2007. *Id.* It also informed Tyler that she would be on layoff status, receiving pay and some benefits, for 120 days. *Id.* Tyler attests that she never received a Form 19E, but does state that she received this letter on January 9, 2007. [DE 36-2 at ¶¶ 20, 40].

Given the clear language of the appointment, Tyler cannot prevail on her claim that Purdue breached the terms of the appointment in laying her off. Although appointments may renew every year if no action is taken, the terms of the appointment clearly permit Purdue to decline to renew an appointment or to terminate an employee at any time. The parties do not

dispute that Tyler received written notice that she would be laid off 31 days before her layoff took effect. Notwithstanding that Tyler was not given the specific Form 19E, this notice is sufficient to satisfy Purdue's obligations under Tyler's appointment. *See Anderson*, 644 N.E.2d at 1290 (refusing to interpret contracts so narrowly as to frustrate their obvious design).

Accordingly, even if Tyler's appointment with Purdue did constitute a contract for employment, the evidence before the Court would not permit a reasonable jury to conclude that Purdue breached it in terminating Tyler.

## 2. Promissory Estoppel

Tyler also brings a claim for promissory estoppel based upon a conversation she had with Gerry McCartney in October, 2006, while he was still Interim Vice-President of Information Technology and Chief Information Officer. Tyler claims that she asked McCartney,

> I just want to know, if you are not interested in having me here, and you are going to go for [the permanent Vice-President and Chief Information Officer] position, and you don't want to do the things that I have been doing, let me know, and I will move on.

[DE 34 at 14; *accord* DE 27-1 at 21]. Tyler claims that McCartney replied, "No, I never said that, I don't want that." [DE 34 at 14; *accord* DE 27-1 at 21]. Tyler argues that she reasonably relied upon McCartney's statement that he wanted Tyler to continue in her position when she rented an apartment. [DE 34 at 15].

In order to support a claim for promissory estoppel in the employment context, a plaintiff must show that: (1) the employer made a promise to the employee; (2) the employee relied on that promise to her detriment; and (3) the promise otherwise fits within the Restatement (Second) of Contracts test for promissory estoppel. *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 895 (Ind. Ct. App. 2007); *Coutee v. Lafayette Neighborhood Hous. Servs., Inc.*, 792 N.E.2d 907, 911

(Ind. Ct. App. 2003). The Restatement (Second) of Contracts defines the doctrine of promissory estoppel as a "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." § 90(1) (1981).

"Although it is recognized that no special form of words is necessary to create a promise, the mere expression of an intention is not a promise." *Security Bank & Trust Co. v. Bogard*, 494 N.E.2d 965, 968-69 (Ind. Ct. App. 1986)). "Nor does a prediction, opinion, or prophecy constitute a promise." *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 847 (Ind. Ct. App. 1990) (citing *Security Bank*, 494 N.E.2d at 968-69)). Instead, "[a] promise is a voluntary commitment or undertaking by the party making it (the promisor) addressed to another party (the promisee) that the promisor will perform some action or refrain from some action in the future." *Medtech*, 555 N.E.2d at 847 (quoting *Woodall v. Citizens Banking Co.*, 507 N.E.2d 999, 1000 (Ind. Ct. App. 1987).

Under this precedent, McCartney's alleged statements to Tyler do not constitute a promise enforceable under promissory estoppel. McCartney's statements are best characterized as statements of his intent or desire. McCartney did not promise that Tyler would remain in her position if he were appointed permanent Vice-President and Chief Information Officer. Instead, he merely denied saying that he did not "want to do the things that [Tyler had] been doing", and told Tyler that he did not want her to leave. Moreover, McCartney could not have reasonably expected these statements about his desires to induce any action by Tyler. *See* Restatement § 90(1). Finally, even if McCartney's statements were construed as a promise not to eliminate Tyler's position, enforcement of such a promise would not be the only way to avoid injustice.

24

*See id.* Many other remedies, such as damages for the cost of an unnecessary apartment, would serve the ends of justice better than ordering Tyler's reinstatement in her old position.

**Conclusion**

Based on the foregoing, Defendant's Motion for Summary Judgment [DE 24] is hereby GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Defendant and against Plaintiff on all claims, and to treat this case as closed.

SO ORDERED.

ENTERED:   July 18, 2011

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court